# EXHIBIT 6

## AGREEMENT FOR SERVICES

Smart Document Solutions, LLC ("SDS") and Thompson Health ("Provider"), located at 350 Parrish Street in Canandaigua, NY 14424, enter into this Agreement with reference to the health information management service that SDS will provide to Provider.

1. SDS will provide clerical support staff wherein SDS representatives will receive, open and review all incoming requests for health information, and will work with Provider to determine whether Provider is authorized to release copies of the requested health records. Specific additional duties are described in Exhibit A attached to this Agreement. Provider will conform its policy and procedures to permit SDS to access and scan patient records for the purpose of complying with authorized requests for health information. SDS will also provide access to eSmartLog®, an enterprise-wide, internet based, secure electronic release-of-information tracking system, as described in Exhibit B, and eDisclose™, an enterprise-wide, internet based, secure electronic disclosure tracking system, as described in Exhibit C. SDS will also provide SmartLink®, an electronic medical records interface software, as described in Exhibit D.

2. Provider will supply SDS's representative(s) with QIO(Quality Improvement Organization) requests at least two weeks before such requests are due (excluding on-site reviews) in order to allow sufficient processing time.

3. Provider and SDS acknowledge that nothing contained in this Agreement is intended to nor shall it have the effect of diminishing or eliminating the right of any patient as otherwise provided by law to have access to his or her medical records for purposes of inspection and/or copying.

4. SDS will provide all scanning equipment and supplies necessary to process requests for health information. SDS's representative(s) will use Provider's equipment to copy STAT requests and any other requests that cannot be processed through SDS's scanning system, and will use Provider's equipment and supplies to duplicate health information stored on microfilm. SDS is not responsible for the reproduction of photographs or x-rays.

5. SDS will reproduce one and one-half(1.5) professional courtesy pages for every one(1) billable page, with additional professional courtesy pages (those exceeding the ratio) scanned/copied at a rate of 15¢ per page. SDS agrees not to exceed 1:1.5 ratio without prior approval from facility.

   As a contractual agent of Provider, SDS is not recognized by many health or workers' compensation insurers as being the source of medical record information. Additionally, in many instances, Provider is not permitted to charge such insurers for copies of medical records related to claims and/or eligibility. SDS will presume that Provider is not permitted to charge such insurers for copies of medical records unless Provider has so indicated by providing SDS with a copy of such payment policy, and will treat such requests as "non-billable," counting such pages toward Provider's ratio.

   SDS will pre-bill all billable patient requests.

Full Service Hospital: 5/06

6. <u>QuickView®</u>: Provider agrees to receive, on Provider's computer equipment and software, and via its Internet account, the information that it requests via QuickView®, SDS's online delivery service with a print option, at no charge.

7. SDS will bill Provider for the cost of postage applied to only non-billable requests on a monthly basis.

8. SDS's representative(s) will log that the requested records were processed and mailed to the requesting party utilizing the Meditech Correspondence Module.

9. No original medical records, charts or files will be removed from Provider for any purpose.

10. All checks for prepayment fees mailed to Provider with requests for health information will be endorsed by Provider, if necessary, and given to SDS's representative(s). Prepayment checks not remitted to SDS will be billed to the facility on a monthly basis. SDS is solely responsible for the collection of all fees due from requesting parties for the processing of medical record requests by SDS's representative(s).

11. Upon receipt of the monthly invoice for SDS's services, Provider will pay to SDS the amount owing, if any, for such items as postage, clerical support, and other services.

12. <u>Confidentiality and Indemnification</u>:

    12.1    SDS respects all confidentiality rights regarding patient information contained in patient medical records. Any disclosure of health information will be limited to that portion of the medical record needed to fulfill the specific purpose of the authorized disclosure.

    12.2    Unless expressly authorized by the patient or the patient's duly appointed and authorized representative, SDS will not release any records regarding psychiatric care, alcoholism/alcohol abuse, drug abuse, HIV or HIV test results. Provider shall be solely responsible for securing, verifying and approving authorization for the reproduction of any records regarding psychiatric care, alcoholism/alcohol abuse, drug abuse, HIV or HIV test results.

    12.3    SDS assumes no responsibility for any losses or liability that result, directly or indirectly, from inaccurate information, incorrectly dated material, insufficient or improper authorizations, or any other type of faulty medical record documentation that is furnished by Provider to SDS.

    12.4    SDS will indemnify and hold harmless Provider itself against and with respect solely to liabilities which the Provider actually incurs to private third persons, firms or entities, so long as such liabilities: (i) are evidenced by final and non-appealable judgments of a court of competent jurisdiction, and (ii) arise out of and are limited to the negligent acts and activities of SDS in scanning, copying and/or disseminating health information that violates such private third persons, firms or entities' right of privacy.

    12.5    SDS will not (i) store any records, (ii) keep any negatives, (iii) use any microfilm, or, under any circumstances, (iv) release health information to any person other than as directed by the duly authorized requesting party.

12.6    At Provider's request, SDS's representative(s) will sign Provider's Confidentiality Statement.

12.7    SDS represents and warrants that it complies with applicable (1) electronic data transmission standards that are required by U.S. government agencies for the transmission of health information, and (2) laws and regulations that protect the privacy and security of individually identifiable health information, including regulations promulgated under the federal Health Insurance Portability and Accountability Act. Upon Provider's request, SDS will enter into a Business Associate Agreement (or addendum) required by such regulations.

13.    SDS has a $3,000,000 Errors and Omissions liability insurance policy which insures against a negligent act, error or omission and the oral or written publication of material that violates a person's right of privacy.    SDS also has a $1,000,000.00 per occurrence/$2,000,000 general aggregate Commercial General Liability Policy. Evidence of coverage will be provided to Provider upon request.

14.    SDS's representative(s) are hired, trained and managed by SDS. SDS invests substantially in advertising and recruiting, as well as in testing and training of its representative(s). Reasonable efforts will be made to place representatives that best meet the needs of Provider, therefore, Provider may decline, for good cause only, to have any particular SDS representative work at Provider's site. Provider agrees not to solicit any SDS representative to become an employee of Provider either while representative is working for SDS or for a minimum of 90 days after employee terminates from SDS. If Provider solicits or recruits said employee during this specified period, Provider agrees to (i) pay SDS a transfer fee of $5,000, and (ii) give SDS two weeks' notice to replace the representative.

15.    The term of this Agreement is one year, commencing on the date the Agreement is signed by the latter of the parties. The Agreement will automatically renew for a one-year term unless expressly terminated in writing at least 60 days prior to expiration. Provider and SDS, at option of either party, may also terminate this Agreement for any or no reason upon 60 days' written notice. If termination is due to breach by either party then, upon receipt of 60-day notice, the receiving party shall have 60 days to cure the breach condition to avoid termination. All notices sent to SDS must be addressed to Legal Department, Smart Document Solutions, 120 Bluegrass Valley Parkway, Alpharetta, GA 30005.

**SMART DOCUMENT SOLUTIONS, LLC**

BY: _____

DATE: _____7- 20-07_____

**THOMPSON HEALTH**

BY: _____

DATE: _____7/6/07_____

Full Service Hospital: 5/06

## AGREEMENT FOR SERVICES

### Exhibit A

This Exhibit lists the specific duties, in addition to those listed in the Agreement, required of SDS at Provider's location:

- Processing of one and one-half courtesy pages compared to billable (1.5:1 ratio). Processing of any courtesy requests that exceed the 1.5:1 ratio will be charged to the facility at $.15 cents per page. Ratio will be waived for initial 60 days of service. SDS will provide bi-weekly statistics report to facility for initial 60 days and then monthly. SDS agrees not exceed ratio without prior approval from facility.

- All equipment and desk supplies needed to process requests for medical information

- eSmartLog, our ROI logging and tracking system for authorized requests and our accounting of disclosure product, eDisclose

- Computer, printer and scanning equipment

- Research and identification of patient requests

- Verification of HIPAA compliant authorization

- Look up request in MPI system

- Logging of all requests into Meditech Correspondence Module

- Process send back requests

- Pull medical records and order from offsite storage(if applicable)

- Scan, package and mailing of copies with 3 day trackable turnaround through USPS

- Postage on all billable requests

- Handling of questions and customer service concerns from requesters

- Answering of telephone calls related to ROI issues when on site

- Complete outstanding requests that are in process at time of implementation

- Facility will install Sophos Virus Protection version 6.5.5 on SDS computer(s).

## AGREEMENT FOR SERVICES

### Exhibit B - eSmartLog℠

SDS will provide to Provider access to eSmartLog (the "Product"), which is an enterprise-wide, Internet-based, secure electronic release-of-information tracking system.

**1. Software.** SDS grants Provider a nonexclusive, nonassignable, nontransferable right to use the Product, which is distributed exclusively by SDS, at no charge, so long as this agreement remains in effect. Provider is solely responsible for maintaining an appropriate Internet account for accessing the Products. SDS is not responsible for the Internet connection's cost, speed, reliability or utility.

**2. Term and Termination.** This Agreement will continue concurrent with the underlying Agreement for Services between SDS and Provider (the "Underlying Agreement"). Upon any termination of the Underlying Agreement, SDS will eliminate Provider's access to the Product.

In the event of any termination, a hard copy of tracked information, to date, may be printed by Provider, at Provider's discretion and cost, for up to one week following termination. Additionally, SDS agrees to provide electronic format of tracked information to Provider.

**3. Assignment.** This Agreement will be binding on the parties to it and their respective legal representatives, successors and assigns.

**4. All Modifications to be in Writing.** No modification of this Agreement will be binding unless in writing and signed by duly authorized agents of SDS and Provider.

**5. Software Support.** SDS will provide Provider with toll-free telephone assistance for Provider inquiries related to the use of the Product and the reporting of problems with the Product.

**6. Administrator.** Provider will jointly appoint, with SDS, a person to oversee and coordinate its use of the Product. Provider shall maintain the integrity of the Product on the designated system.

**7. Limitations to Service Obligations.** SDS's obligations under this agreement are limited as follows:

    a.    *Designated Support* - SDS shall provide support services for the Product during normal business hours (8:00 a.m.-5:00 p.m. EST or EDT, Monday through Friday).

    b.    *Instructions/Guidelines* - SDS shall not provide any services if Provider has failed to follow the instructions and guidelines for using or maintaining the Product set forth in the documentation provided, or is operating the Product on a hardware/software platform that does not meet the minimum technical requirements.

    c.    *Data Backup* - Daily back-up of data within the Product is performed by SDS's Data Center employees and is the sole responsibility of SDS.

    d.    *Program Corrections* - SDS will correct programming errors at its expense.

**8. Indemnification.** SDS and Provider will each indemnify and hold harmless the other against and with respect solely to liabilities incurred to private, third persons, firms or entities, so long as such liabilities arise from and are limited to the negligent acts and activities of the indemnifying party in performing its obligations under this Agreement.

## AGREEMENT FOR SERVICES

### Exhibit C – eDisclose™

SDS will provide to Provider access to eDisclose (the "Product"), which is an enterprise-wide, Internet-based, secure electronic information disclosure tracking system.

**1. Software.** SDS grants Provider a nonexclusive, nonassignable, nontransferable right to use the Product, which is distributed exclusively by SDS, so long as this agreement remains in effect. Provider is solely responsible for maintaining an appropriate Internet account for accessing the Product. SDS is not responsible for the Internet connection's cost, speed, reliability or utility.

**2. Term and Termination.** This Agreement will continue concurrent with the underlying Agreement for Services between SDS and Provider (the "Underlying Agreement"). Upon any termination of the Underlying Agreement, SDS will eliminate Provider's access to the Product.

If Provider does not maintain an Underlying Agreement with SDS, this Agreement will continue on a month-to-month basis. In the event of any termination, a hard copy of tracked information, to date, may be printed by Provider, at Provider's discretion and cost, for up to one week following termination, or an electronic version of the tracked information may be requested from SDS by Provider.

**3. Assignment.** This Agreement will be binding on the parties to it and their respective legal representatives, successors and assigns.

**4. All Modifications to be in Writing.** No modification of this Agreement will be binding unless in writing and signed by duly authorized agents of SDS and Provider.

**5. Software Support.** SDS will provide Provider with toll-free telephone assistance for Provider inquiries related to the use of the Product and the reporting of problems with the Product.

**6. Administrator.** Provider will jointly appoint, with SDS, a person to oversee and coordinate its use of the Product. Provider shall maintain the integrity of the Product on the designated system.

**7. Limitations to Service Obligations.** SDS's obligations under this agreement are limited as follows:

    a.   *Designated Support* - SDS shall provide support services for the Product during normal business hours (8:00 a.m.-5:00 p.m. EST or EDT, Monday through Friday).

    b.   *Instructions/Guidelines* - SDS shall not provide any services if Provider has failed to follow the instructions and guidelines for using or maintaining the Product set forth in the documentation provided, or is operating the Product on a hardware/software platform that does not meet the minimum technical requirements.

    c.   *Data Backup* - Daily back-up of data within the Product is performed by SDS's Data Center employees and is the sole responsibility of SDS.

    d.   *Program Corrections* - SDS will correct programming errors at its expense.

**8. Indemnification.** SDS and Provider will each indemnify and hold harmless the other against and with respect solely to liabilities incurred to private, third persons, firms or entities, so long as such liabilities arise from and are limited to the negligent acts and activities of the indemnifying party in performing its obligations under this Agreement.

**9. Fees.** SDS will provide the Product initially at no charge, but reserves the right to renegotiate the rate upon termination or expiration of the underlying agreement.

## AGREEMENT FOR SERVICES

### Exhibit D - SmartLink℠

SDS will provide to Provider SmartLink, SDS's electronic medical records interface software.

Whereas, SDS is in the business of scanning medical record information into an electronic system and has developed, owns and wishes to make available to Provider its proprietary software known as SmartLink (the "Product"), and

Whereas Provider maintains medical record information in electronic format and wishes to obtain the right to use the Product,

**Therefore**, SDS and Provider agree as follows.

1. <u>Description of the Product</u>.  The Product, combined with Provider's own electronic medical record information system, will allow Provider or SDS, with Provider's permission, to access medical records from Provider's system, and link images of the medical record information to SDS's scanning system through the Product via conversion to a TIFF file.   Such information may then be processed through SDS's release-of-information system in which medical record information is released to authorized requestors pursuant to Provider's release-of-information services agreement with SDS.  All files are encrypted and delivered via a secure server.

2. <u>SDS's Responsibilities</u>.  SDS will install, on a computer(s) owned by SDS but located at Provider's location, the Product.  The computer(s) on which any such installation is done must have Internet access prior to any such installation.  The Product is and shall remain the sole property of SDS.  The systems and processes developed and provided by SDS, as well as their selection and arrangement, are protected by copyright, trademark, patent, and/or other intellectual property laws, and any unauthorized use of the systems or processes may violate such laws and this Agreement.  Provider agrees not to copy, republish, frame, download, transmit, modify, rent, lease, loan, sell, assign, distribute, license, sublicense, decompile, reverse engineer, or otherwise attempt to discover the source code of the software available, or create derivative works based on the Product, its systems or processes, its materials, or its services or their selection and arrangement, except as expressly authorized herein.  Any attempted or successful reverse engineering or dissembling will result in de-installation of the Product and the filing for an immediate injunction against Provider, in addition to any other available damages.

3. <u>Representations and Warranties</u>.  SDS represents and warrants that third-party licenses utilized in the Product, if any, will be obtained by SDS prior to installation of the Product and that no infringement of any copyrights will occur.  Should any action be brought against Provider for infringement due to the Product or its installation, SDS will indemnify and defend Provider against such action.  SDS PROVIDES THE PRODUCT "AS IS" WITHOUT ANY OTHER WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

4. <u>Updates</u>.  Periodic updates will be provided to Provider automatically, and SDS will timely apply such updates.

5. <u>Term and Termination</u>.  This Agreement is effective on the date last executed below and will run simultaneously with Provider's Agreement for Services. Upon termination, the Product will be de-installed, and all software and documentation will be immediately returned to SDS.

6. <u>Pricing</u>.  The Product is provided to SDS's release-of-information clients at no charge for the term of the underlying release-of-information agreement.

Full Service Hospital: 5/06

# Thompsonhealth

Supporting Instruction: IM.06.018.00.01
Effective Date 4/30/2006

## BUSINESS ASSOCIATE AGREEMENT

THIS BUSINESS ASSOCIATE AGREEMENT (this "Agreement") is entered into as of the 2? day of July, 2007, by and between Thompson Health, a New York Not-for-Profit Corporation with an address at 350 Parrish St, Canandaigua, NY 14424 (the "Covered Entity") and Smart Document, an independent Contractor with an address at 110 Bluegrass Valley Parkway Alpharetta, GA 30005 (the "Business Associate").

WHEREAS, the Covered Entity and the Business Associate have entered, or may in the future enter, into an agreement or agreements pursuant to which the Covered Entity may disclose certain Protected Health Information to the Business Associate or the Business Associate may create or receive Protected Health Information for or on behalf of the Covered Entity; and

WHEREAS, pursuant to 45 C.F.R. § 164.502(e)(2), the Covered Entity is required to enter into a written contract with the Business Associate which contains satisfactory assurances that the Business Associate will appropriately safeguard the Protected Health Information; and

WHEREAS, this Agreement sets forth the terms and conditions upon which the Covered Entity will disclose Protected Health Information to the Business Associate or will allow the Business Associate to create or receive Protected Health Information for, or on behalf of the Covered Entity.

NOW, THEREFORE, on the mutual covenants and promises contained herein, the parties hereto hereby agree as follows:

1. Certain Definitions
    a. *Data Aggregation Services* shall have the same meaning as is set forth in 45 C.F.R. § 164.501.

    b. *Designated Record Set* shall have the same meaning as is set forth in 45 C.F.R. § 164.501.

    c. *Individual* shall have the same meaning as is set forth in 45 C.F.R. § 164.501.

    d. *Privacy Rules* shall mean the Health Insurance Portability and Accountability Act of 1996 Privacy Rules set forth in 45 C.F.R. part 160 and part 164, subparts A and E.

    e. *Protected Health Information* shall have that same meaning as is set forth in 45 C.F.R. § 164.501.

    f. *Required by Law* shall have the same meaning as is set forth in 45 C.F.R. § 164.501.

    g. *Secretary* shall mean the Secretary of the United States Department of Health and Human Services or his/her designee.

# Thompson health

Supporting Instruction: IM.06.018.00.01
Effective Date: 4/30/2006

2. Services The Covered Entity and the Business Associate have entered, and may in the future enter, into service agreements (the "Service Agreements") pursuant to which the Business Associate provides services to the Covered Entity that require the use or disclosure of Protected Health Information (the "Services"). Except as expressly provided herein or as otherwise required by Law, the Business Associate may only use or disclose the Protected Health Information for the purpose of providing the Services. The Business Associate expressly agrees that any and all uses or disclosures of the Protected Health Information by the Business Associate will be done in accordance with the terms of this Agreement and the provisions of all applicable federal and state laws and regulations, including without limitation, the Privacy Rules.

3. Obligations and Activities of the Business Associate The Business Associate hereby agrees:

   a. not to disclose the Protected Health Information other than as permitted or required by this Agreement, the Service Agreements or as otherwise Required by Law;

   b. to use appropriate safeguards to prevent use or disclosure of Protected Health Information not expressly permitted by this Agreement, the Service Agreements or as Required by Law;

   c. to mitigate, to the extent practicable, any harmful effects, of which the Business Associate becomes aware, that arise out of the use or disclosure of Protected Health Information by the Business Associate that is in violation of this Agreement;

   d. to report to the Covered Entity any use or disclosure of the Protected Health Information not specifically permitted by this Agreement of which it becomes aware;

   e. to ensure that any agent, including but not limited to any subcontractor or employee, to whom the Business Associate provides any Protected Health Information received from the Covered Entity, or created or received by the Business Associate for or on behalf of the Covered Entity, agrees to the same restrictions as apply through this Agreement to the Business Associate with respect to the Protected Health Information. Notwithstanding the foregoing, the Business Associate shall only disclose that Protected Health Information to such agents as is reasonably necessary to perform the Services or to fulfill a specific function required or permitted under this Agreement;

   f. with reasonable notice from the Covered Entity and during all regular business hours of the Business Associate, or at such times and upon such terms as the Secretary may require, the business associate shall make available to the Covered Entity or the Secretary all internal practices, books and records, including but not limited to policies and procedures relating to the use and disclosure of Protected Health Information received from, or created or received by the Business Associate from or on behalf of the Covered Entity necessary to allow the Secretary to determine whether the Covered Entity is in

**Thompson**health

Supporting Instruction: IM.06.018.00.01
Effective Date 4/30/2005

compliance with the Privacy Rules;

g. to document all disclosures of Protected Health Information and such other information related to the disclosure of Protected Health Information as may reasonably be necessary for the Covered Entity to respond to any request by an Individual for an accounting of disclosures of Protected Health Information as permitted by 45 C.F.R. 164.528;

h. within thirty (30) days of receiving a written request from the Covered Entity, to provide to the Covered Entity, or an Individual, all information collected in accordance with Section 3(g) of this Agreement;

i. if the Business Associate maintains Protected Health Information in a Designated Record Set

- upon five (5) days prior notice from the Covered Entity and during all regular business hours of the Business Associate, to provide access to Protected Health Information to the Covered Entity or, as directed by the Covered Entity, to an Individual, contained in such Designated Record Set, as required by 45 C.F.R. 164.524;

- within a reasonable period of time after receiving written notice from the Covered Entity, the Business associate shall make any amendment(s) to Protected Health Information contained in a Designated Record Set as directed by the Covered Entity, pursuant to 45 C.F.R. 164.526;

j. to implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of the Electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of the Covered Entity;

k. to ensure that any agent, including a subcontractor, to whom it provides such Electronic Protected Health Information agrees to implement reasonable and appropriate safeguards to protect it;

l. to report to the Covered Entity any security incident of which it becomes aware; and

m. to authorize termination of the contract by the Covered Entity, if the Covered Entity determines that the Business Associate has violated a material term of the Agreement.

4. Permitted Uses and Disclosures by the Business Associate. Except as otherwise limited by this Agreement, the Business Associate may use or disclose the Protected Health Information to perform functions, activities or services for, or on behalf of, the Covered Entity as set forth in the applicable Service Agreement, provided that such use or disclosure, if made by the Covered Entity, would not violate the Privacy Rules or Minimum Necessary policies and procedures of the Covered Entity.

# Thompsonhealth

Supporting Instruction: IM.06.018.00.01
Effective Date: 4/30/2006

5.  **Specific Use and Disclosure Provisions.** Except as otherwise limited by this Agreement, the Business Associate may:

    a.  use the Protected Health Information for the proper management and administration of the Business Associate or to carry out the legal responsibilities of the Business Associate;

    b.  disclose the Protected Health Information for the proper business administration of the Business Associate, provided that:

        i. Any such disclosure is Required by Law, or

        ii. The Business Associate obtains reasonable assurances from the person to whom the information is disclosed (the "Third Party") that (a) the Protected Health Information will remain confidential and will only be used or further disclosed for the purpose for which it was disclosed to such Third Party or as may otherwise be Required by Law, and (b) the Third Party agrees to notify the Business Associate of any instances of which the Third Party becomes aware in which the confidentiality of the Protected Health Information has been breached;

    c.  use the Protected Health Information to provide Data Aggregation Services to the Covered Entity, as permitted by 45 C.F.R. 164.504(e)(2)(i)(B); and

    d.  Use the Protected Health Information to report violations of law to appropriate federal and state authorities, consistent with 45 C.F.R. 154.502(j)(1).

6.  **Obligations of the Covered Entity.** The Covered Entity shall notify the Business Associate of:

    a.  any limitation(s) in its Notice of Privacy Practices, as required by 45 C.F.R. 164.520, to the extent that such limitation(s) may affect the Business Associate's use or disclosure of the Protected Health Information;

    b.  any changes in, or revocation of, permission by an Individual to use or disclose Protected Health Information, to the extent that such change or revocation may affect the Business Associate's use or disclosure of Protected Health Information; and

    c.  Any restriction(s) on the use or disclosure of Protected Health Information that the Covered Entity has agreed to in accordance with 45 C.F.R. 164.522, to the extent that such restriction(s) may affect the Business Associate's use or disclosure of Protected Health Information.

7.  **Permissible Requests of the Covered Entity.** The Covered Entity shall not request the Business Associate to use or disclose any Protected Health Information in any manner that would not be permissible under the Privacy Rules if done by the Covered Entity, except as may otherwise be provided by Section 5 of this Agreement.

# Thompsonhealth

Supporting Instruction: IM.06.018.00.01
Effective Date: 4/30/2006

## 8. Term and Termination

a. *Term*     This Agreement shall be effective as of the date first set forth above and shall terminate when all of the Protected Health Information provided by the Covered Entity to the Business Associate, or created or received by Business Associate on behalf of Covered Entity, is destroyed or returned to Covered Entity, or, if it is not feasible to return or destroy the Protected Health Information, protections are extended to such information, in accordance with this Section 8.

b. *Termination by the Covered Entity for Cause*. If the Business Associate breaches this Agreement, the Covered Entity, in its sole discretion, may:

    i. Provide the Business Associate written notice that the Business Associate has breached this Agreement and provide the Business Associate an opportunity to cure the breach to the satisfaction of the Covered Entity within ten (10) days, after which time this Agreement and all of the Service Agreements shall be automatically terminated if the breach is not cured;

    ii. Immediately terminate this Agreement and the Service Agreements if the Business Associate has breached a material term of this Agreement and cure is not possible; or

    iii. If neither termination nor cure is feasible, the Covered Entity shall report the violation to the Secretary.

c. *Termination by the Business Associate*. So long as any Service Agreement by and between the Covered Entity and the Business Associate shall exist, the Business Associate shall have no right to terminate this Agreement.

d. *Automatic Termination*. This Agreement will automatically terminate, without any further action by the parties hereto, at such time as there are no longer any Service Agreements by and between the parties hereto.

e. *Effect of Termination*

    i. Except as provided in Section 7(e) (ii) of this Agreement, upon termination of this Agreement for any reason, the Business Associate shall, if feasible, return or destroy all Protected Health Information received from the Covered Entity, or created or received by the Business Associate for or on behalf of the Covered Entity. This provision shall apply to all Protected Health Information that is in the possession of any subcontractor or agent of the Business Associate. The Business Associate shall retain no copies of the Protected Health Information for its records.

    ii. In the event that the Business Associate believes that returning or destroying the Protected Health Information is not feasible, within ten (20)

# Thompson health

Supporting Instruction: IM.06.018.00.01
Effective Date: 4/30/2006

days of any termination hereof the Business Associate shall provide written notice to the Covered Entity setting forth the conditions that the Business Associate believes make return or destruction of the Protected Health Information not feasible. Within a reasonable time frame of its receipt of such notice from the Business Associate, the Covered Entity shall determine whether the return or destruction of the Protected Health Information is not feasible, and provide written notice to the Business Associate of its decision. The covered entity shall have no right to determine that the return or destruction of Protected Health Information is feasible, if the return or destruction is precluded by law. If the Covered Entity determines that the return or destruction of Protected Health Information is not feasible, the Business Associate shall extend the protections of this Agreement to such Protected Health Information and limit further uses and disclosures of such Protected Health Information to those purposes that make the return or destruction infeasible, for so long as Business Associate maintains such Protected Health Information. If, subject to the terms of this section, the Covered Entity determines that it is feasible to return or destroy the Protected Health Information, the Business Associate shall immediately comply with the provisions of Section 8(e)(i) of this Agreement. From the period during which the Covered Entity and the Business Associate are determining whether the return or destruction of the Protected Health Information is feasible, the Business Associate shall extend the protections of this Agreement to such Protected Health Information and limit use or disclosure of the Protected Health Information to those uses and disclosures necessary to determine whether the return or destruction of the Protected Health Information is feasible.

9. **Indemnification.** The Business Associate hereby covenants and agrees to indemnify and hold harmless the Covered Entity, it agents and representatives from and against any and all losses, costs, expenses, liabilities, claims, demands, judgments and settlements of every nature that are actually incurred by the Covered Entity, including without limitation reasonable attorneys' fees, which arise out of any use or disclosure of Protected Health Information not specifically permitted by this Agreement. The Covered Entity hereby covenants and agrees to indemnify and hold harmless the Business Associate, it agents and representatives from and against any and all losses, costs, expenses, liabilities, claims, demands, judgments and settlements of every nature that are actually incurred by the Business Associate, including without limitation reasonable attorneys' fees, which arise out of any use or disclosure of Protected Health Information not specifically permitted by this Agreement.

10. **Miscellaneous**

   a. *Regulatory References* Any reference made herein to any provision of law or regulation shall be a reference to such section as in effect and as same may be amended from time to time.

# Thompson health

Supporting Instruction: IM.06.018.00.01
Effective Date: 4/30/2006

b. *Amendment*      This Agreement may not be amended except in writing signed by both parties hereto. Both parties hereto agree that this agreement shall be amended to comply with any and all state or federal laws rules, or regulations, including without limitation any future laws, rules or regulations.

c. *Interpretation*      Any ambiguity in this Agreement shall be resolved to permit the parties hereto to comply with the Privacy Rules.

d. *Successors and Assigns*    This Agreement and all rights and obligations hereunder shall be binding upon and shall inure to the benefit of the respective successors and assigns of both parties hereto.

e. *Survival*    The respective rights and obligations of the Business Associate set forth in Section 8 hereof shall survive any termination of this Agreement.

f. *Notices*      All notices which are required to be given hereunder shall be in writing and shall be deemed to have been duly given (a) when delivered personally, (b) the next business day following the day on which the same has been delivered prepaid to a nationally recognized overnight courier service, or (c) three (3) days after sending by registered or certified mail, postage prepaid, return receipt requested, in each case to the address first set forth above to the attention of the person signing below, or to such other person at such other address as the party may designate by giving notice.

g. *Severability*    In the event that any provision of this Agreement is adjudged by any court of competent jurisdiction to be void or unenforceable, all remaining provisions hereof shall continue to be binding on the parties hereto with the same force and effect as though such void or unenforceable provision had been deleted.

h. *Waiver*.    No failure or delay in exercising any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or remedy hereunder preclude any other further exercise thereof or the exercise of any other right, power or remedy. The rights provided hereunder are cumulative and not exclusive of any rights provided by law.

i. *Entire Agreement*  This Agreement and the Service Agreements constitute the entire agreement between the parties hereto relating to the subject matter hereof, and supercede any prior or contemporaneous verbal or written agreements, communications and representations relating to the subject matter hereof.

j. *Counterparts, Facsimile*  This agreement may be signed in two or more counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument. A copy of this Agreement bearing a facsimile signature shall be deemed to be an original.

**Thompson**health

Supporting Instruction: IM.06.018.00.01
Effective Date 4/30/2006

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as
of the date first set forth above.

Thompson Health (Covered Entity)

By: _____

Name: Deborah K Weymouth

Title: SVP/CFO

Date Signed: 5/24/07

[BUSINESS ASSOCIATE]

By: _____

Name: PETER A. SCHMITT

Title: CFO

Date Signed: July 27, 2007